# LINCOLN SQUARE LEGAL SERVICES, INC.

Fordham University School of Law
150 West 62nd Street, Ninth Floor
New York, NY 10023

Tel  212-636-6934
Fax 212-636-6923

October 15, 2025

Honorable Colleen McMahon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007
**By ECF**

Re: *United States v. Rafat Amirov, S8 22 Cr. 438 (CM)*
    **SENTENCING MEMORANDUM**

Your Honor:

      We write on behalf of Mr. Rafat Amirov, who will be sentenced by this Court on October 29, 2025, following his conviction by a jury of Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, Conspiracy to Commit Murder-for-Hire, Conspiracy to Commit Money Laundering, Attempted Murder in Aid of Racketeering, and a 924(c) count. The government pursued this case with unusual vigor—devoting tremendous resources to this investigation, seizing Mr. Amirov in a distant place, transporting him thousands of miles from his family and home, and insisting he play his role in a trial that, in the end, did not bring those most responsible for these events to justice.

      As the presentence report correctly notes, the United States Sentencing Guidelines ("Guidelines") overstate the seriousness of this offense. *See* Presentence Investigation Report & Addendum ("PSR") at 43. The parsimony principle of 18 U.S.C. § 3553(a), which mandates that a sentence be "sufficient, but not greater than necessary," requires that the Court exercise its "very wide latitude" to vary downward. *United States v. Cavera*, 550 F.3d 180, 188–89 (2d Cir. 2008) (en banc) (noting the sentencing court's considerable discretion to vary downward from the Guidelines in conformity with the statute). We urge that a total sentence of no more than 156

months of imprisonment, which includes the 60-month mandatory sentence required by the 924(c) conviction, complies with all the statutory requirements and does justice in this case.

## I.    18 U.S.C. § 3553(a) Requires a Downward Variance

The governing statute, 18 U.S.C. § 3553(a), first directs the Court to consider the nature and circumstances of the offense and Mr. Amirov's history and characteristics. A downward variance from the Guidelines is warranted under both subparts of each prong. First, given the nature of this offense, the proper baseline for the crime for which Mr. Amirov was convicted is the 10-year maximum for murder-for-hire, not the Guideline calculation in the PSR, which misanalyzes this as a money laundering case and would punish the same conduct duplicatively. Second, given the circumstances of this offense, Mr. Amirov does not deserve the harshest sentence that could be meted out. No injury resulted, and he was not the main protagonist. Other, more blameworthy parties used him to shield themselves and have not been brought to justice.

Mr. Amirov's history and characteristics also militate in favor of a significant downward variance. He is a 46-year-old family man with no prior convictions. He has endured extraordinary hardships as this case has unfolded, including his rendition to the United States and harsh conditions of confinement, so far from his home and family. His former life has been completely shattered, yet Mr. Amirov has remained respectful of the United States justice system and the Court. He has made positive contributions to the MDC environment for his fellow inmates and remains committed to his family and sense of duty. Taken together, the nature and circumstances of the offense and his history and characteristics, strongly support the PSR's recommendation of a downward variance, and justice requires a sentence with total imprisonment of no more than 156 months of incarceration.

### A.  The Nature and Circumstances of the Offense

#### i.    The Nature of the Offense

We turn first to the nature and the circumstances of the offense, as directed by § 3553(a). When considering the nature of the offense under § 3553(a), courts look to the type of offense committed. *See United States v. Messina*, 806 F.3d 55, 60–67 (2d Cir. 2015) (affirming the district court's downward variance and analyzing the seriousness of the crime under the nature of offense factor of the sentencing statute). The nature of the offense is best understood through the statute, which reflects the dispositive Congressional statement on the blameworthiness of the offense. The legislature has dictated that a conviction for the crime of use of interstate commerce facilities in the commission of murder-for-hire, in which the victim was not injured, has an upper bound of punishment of 10 years. *See* 18 U.S.C. § 1958.

By contrast, when personal injury results, the statutory maximum becomes 20 years. *See id.* When death results, the statutory maximum becomes life in prison. *See id.* These maxima

2

reflect Congress's understanding of the nature of the differing versions of this offense and where they stand relative to other offenses. Congress has clearly laid out its intention that the worst kind of attempted murder-for-hire in which no injury results shall have a sentencing cap of 10 years.

Concurrent sentences on Counts 1 through 4 are warranted because all four counts charge essentially the same conduct, and although the crimes have distinct elements, they caused the same harm. As the Court is aware, Count 2 charges conspiracy, the inchoate form of the completed crime charged in Count 1. Concurrent sentences for a conspiracy and its realized offenses are common and reflect a settled understanding that the harm of the planning merges into the completed offense.

Count 4 charges that same conduct as part of a broader course of conduct. Accepting the conviction, as we must, the trial evidence showed that, at most, Mr. Amirov played a minimal role in the events underlying the separate charges pending against others in the Eastern District. Here, while the separate racketeering crime was legally charged, the harm caused by Mr. Amirov's conduct is completely addressed by the sentence we urge. Finally, Count 3 charges a relatively modest conspiracy to commit money laundering that was integral to the attempted murder-for-hire. That charge too should merge into the attempted murder-for-hire for sentencing purposes. On this record, it would emphasize form over substance and violate § 3553 for the length of the sentence to rest upon the money laundering count.

Counts 1 through 4 all arise from the same conduct and would be properly punished by the concurrent sentences urged above. We do not deprecate the seriousness of the crime of attempted murder-for-hire; we only urge attention to Congress's view of that crime. Among cases where no injury resulted, this is not the worst situation imagined by Congress. While the government had discretion to charge the same nexus of facts in multiple counts in this case, that charging decision cannot dictate sentencing. Sentencing is a judicial function and must conform with the principles of § 3553.

We recognize the Court's power to impose consecutive sentences where multiple counts charge distinct crimes arising from the same conduct, as well as its authority to impose a longer sentence on the money laundering count, which carries a higher statutory cap. The power to structure a sentence resulting in total imprisonment greater than the statutory maximum for the primary count of conviction must be used sparingly for a host of reasons, including the parsimony principle, the unfairness of double counting and duplicative punishment, and the problems of usurping the jury's role and avoiding undue sentencing disparities. Beyond the legal problems, we urge that this record, which the Court knows in detail, does not support total punishment of more than 15 years for Mr. Amirov. He does not deserve such severity.

While attempted murder-for-hire is undoubtedly a serious offense, the statute has a 10-year cap. This case does not present the kinds of facts that warrant consecutive sentences to exceed that statutory cap; there is no uncharged relevant conduct and no extraordinary need for the kind

of severe punishment usually reserved for those who kill or harm the most vulnerable, or require long-term confinement to ensure our public safety. More fundamentally, Congress set the statutory cap, which cannot be changed by all the artful charging and public outcry over the actions of the foreign state actors in this case. The nature of the crime calls for a sentence no higher than 10 years for an attempted murder-for-hire in which no injury resulted.

### ii.    The Circumstances of the Offense

The circumstances of this offense also warrant a downward variance to a sentence below the 10-year baseline. As the Court knows, Mr. Amirov was thousands of miles and one or two intermediaries away from the scene of the cooperating witness's bizarre behavior on the streets of Brooklyn. While it is hair-raising to think that there was an assault weapon and ammunition stowed in a bag in Mr. Mehdiyev's car, it is also true that the gun was never removed from the bag and the actions of the cooperating witnesses gave rise to some questions about whether Mr. Mehdiyev was primed to act or too lost in his own unknown intentions to act with effect. *See* Trial Tr. Day 1, 44:11–45:2; Trial Tr. Day 2, 310: 3–10. Whether he would have acted or not, the fact remains that no one was harmed. This record illustrates that those who plan from afar, through intermediaries, and aim to send a message more than to inflict physical harm, pose less risk precisely because they are more likely to fail.

The circumstances of Mr. Amirov's rendition and detention in the United States as a foreign national, along with the atypical nature of his adjudicative process, provide additional compelling grounds for a downward variance below the 10-year cap. Since his rendition and custody in the United States, he has been an involuntary traveler to a strange and forbidding land. Taken from everyone and everything he knows, Mr. Amirov has been challenged to navigate a foreign legal system without the support of his family, who remain in Azerbaijan. Within the MDC, he faces persistent challenges of confinement, further complicated by language and cultural barriers, as we develop separately below.

When Mr. Amirov completes his sentence, he will be approaching 60 (or beyond) and will be immediately removed from the United States. As such, he is very unlikely to offend our laws again. He, more than anyone, now appreciates the reach of our justice system. Upon his return home, he will face the painful reality of years lost with his wife, his growing children, and his aging parents. Even if the Court imposes the lowest sentence urged, Mr. Amirov will miss the critical latter half of his children's childhoods and may never see his parents again. He faces a future marked by uncertainty and isolation. His best hope, after a lengthy incarceration, is the chance to return to Azerbaijan and piece together what remains of his life—a harrowing and bleak prospect.

Another relevant circumstance is that Mr. Amirov was not offered a plea, as the government noted on the record before the trial began. We submit that the government was motivated by the politically charged nature of the case, the significant publicity it received, and its

desire to use the trial to send a message to both domestic and foreign audiences. Mr. Amirov should not be excessively punished because the government wanted to take this case to trial, whatever its reasons. As this Court knows, about 98% of criminal convictions in the United States stem from guilty pleas. *See 2023 Plea Bargain Task Force Report Urges Fairer, More Transparent Justice System*, Am. Bar Ass'n (Feb. 22, 2023), https://www.americanbar.org/news/abanews/aba-news-archives/2023/02/plea-bargain-task-force/. Plea deals generally bring significant sentence reductions through the dismissal of charges, adjustments for stipulations to lower offense levels, and perhaps most significantly, by leaving the record undeveloped and the full scope of the conduct uncertain.

Mr. Amirov did not have the opportunity to engage in such bargaining, depriving him of these benefits and placing significant sentencing power in prosecutors' hands. *See United States v. Kupa*, 976 F. Supp. 2d 417, 428 (E.D.N.Y. 2013) (discussing the excessive power held by prosecutors when it comes to influencing sentencing outcomes through plea bargaining and charging decisions). If not for the public-facing nature of Mr. Amirov's case, he would have been afforded the opportunity to engage in plea negotiations, as typically happens even in most serious, high-profile cases. Mr. Amirov should not be disproportionately punished for the government's choice to insist on a trial in this matter. Attempted murder-for-hire is a serious crime, but not as serious as a murder-for-hire in which injury or death results. And among attempted murder-for-hire cases, this was not the worst version of that crime. This case is distinguished by the lack of injury, Mr. Amirov's rendition, the lack of any real plea negotiations, and the fact that this plot was hatched by state actors who used Mr. Amirov to advance their own agendas. Although serious, this case does not require or justify a sentence among the harshest imposed by federal judges upon those convicted of federal crimes.

### B. Mr. Amirov's History and Characteristics

#### i.  Mr. Amirov's History

In determining an appropriate sentence, 18 U.S.C. § 3553(a) also directs the Court to consider the defendant's history and characteristics. Mr. Amirov is 46 years old. He is devoted to his wife and children, and this is his first criminal conviction. As the PSR notes, he grew up in a very different milieu from most criminal defendants who appear before this Court, as his life was decisively shaped by the fall of the Soviet Union and the rise of the modern Russian kleptocratic state. *See* PSR ¶ 119. Like many others, he navigated those challenging economic realities in ways that do not neatly map onto American expectations.

We do not seek to excuse or defend all his choices, but we note that he did not shirk from the evidence about his life and role in society in Azerbaijan—a place the PSR recognizes was "known for its rampant criminal elements." Appendix A to the PSR, at 43. We urge that his path be seen in the historical context and challenging reality in which it unfolded. While this case does

not turn on his associations and actions in that milieu, those circumstances provide essential context to the conduct at issue here. The trial evidence further revealed that his authority within his network was contested and that he had many rivals.

Viewed in its proper context, Mr. Amirov's conduct reflects the lifelong constraints he faced and the performative nature of his role. Like his role in this case, his projected authority often overstated the control he actually held. Therefore, we urge the Court to resist any effort to punish him for his life in Azerbaijan. Those judgments belong to that nation's authorities, who are better positioned to determine relevant facts and apply their own laws.

### ii. Mr. Amirov's Characteristics

As hard fought as this case was, Mr. Amirov has always strived to show respect for everyone he has encountered in the United States, to carry himself with dignity, and to help those around him. These qualities reflect the same values that have long defined his role within his family and community in Azerbaijan. Mr. Amirov is viewed as "the pillar of [his] family," providing moral guidance for his wife, children, parents, and siblings. *See* Letter of ██████████, Wife, Ex. A; Letter of ██████████, Sister, Ex. B; Letter of ██████████, Sister, Ex. C. His absence over the past 33 months has taken a profound emotional and psychological toll on his family, who deeply miss their role model and confidant.

The separation has been particularly hard on his 71-year-old mother and 74-year-old father, who both suffer from serious health problems and fear they may never see their son again. *See* Letter of ██████████, Mother, Ex. D; Letter of ██████████, Father, Ex. E. ██████████ explains that during the 33 months of separation, she has cried daily and now wishes only to see her "child free again and to hold him in [her] arms once more." Ex. D.

Mr. Amirov's three teenage children are similarly desperate to see their father, whom they describe as their "closest friend," "protector," and "greatest supporter." *See* Letter of ██████████, Daughter, Ex. F; Letter of ██████████, Younger Son, Ex. G; Letter of ██████████, Eldest Son, Ex. H. They express how their studies and relationships have suffered in his absence. *See* Ex. F; Ex. G; Ex. H. ██████, in particular, recalls the "trauma" of watching his father's arrest 33 months ago, a day that continues to haunt him. *See* Ex. H.

Mr. Amirov loves his family deeply and frequently expresses his desire to live a better life and care for them. Several inmates observe how profoundly he misses his family and how he hopes to give his children the education and opportunities he never had. *See* Letter of Neophytos Georgiou, Ex. J; Letter of Peter Weinzierl, Ex. K. As the PSR acknowledges, serving any term imposed in the United States would cause "more of a sense of isolation" for Mr. Amirov than for other BOP inmates who were either born or have family in the United States. Appendix A to the PSR, at 43.

Even in confinement, those same qualities of empathy, responsibility, and respect for others, have continued to define his conduct at the MDC. Mr. Amirov's fellow inmates consistently describe him as a model inmate. Neophytos Georgious and Douglas Valiant Engstrom characterize him as a "beacon of warmth and kindness" and a "pillar of our small community." Ex. J; Letter of Douglas Valiant Engstrom, Ex. L. Nathaniel Moore calls him a "positive example of the way that a person should live and conduct themselves." Letter of Nathaniel Moore, Ex. M.

Mr. Amirov is known as a peacemaker at MDC. He has intervened to break up fights, preventing "potential race wars, religious riots and plots against staff[.]" Ex. M. His integrity and conflict-resolution skills have fostered a better living environment within his unit. Inmates also emphasize Mr. Amirov's caring and compassionate nature. He "treats everyone with respect and equitability," often providing moral support and a listening ear. Ex. L. One cell neighbor recounted how Mr. Amirov helped another inmate through a mental and emotional crisis, "show[ing] care and support towards him with uplifting words and prayers despite [Mr. Amirov's] language barrier." Letter of David Ibarra, Ex. N.

These accounts speak volumes of his character, revealing an empathic man capable of bringing people together, even in the most difficult of circumstances. We recognize that fellow inmates are not the references to whom one might first turn. However, they are now the people who know Mr. Amirov best. Their accounts ring true, and we believe the Court's own observations of Mr. Amirov support the conclusion that, while one may disagree with his past choices, the many positive aspects of his character cannot be overlooked.

The PSR details only one incident report in Mr. Amirov's record. *See* PSR ¶ 22 (summarizing Mr. Amirov's behavior while in custody at MDC). The isolated occurrence arose from a rather ordinary disciplinary matter—specifically, a charge for Refusing to Obey an Order. Notably, Mr. Amirov has not incurred any citations for violent behavior during his time in custody, which lends further credence to the characterization of him by his fellow inmates as a peacemaker.

Honor and respect for others are defining principles for Mr. Amirov, reflected not only in his familial relationships, but also in his personal code of conduct. Mr. Amirov acknowledges his association with the Thieves-in-Law, as the group shaped him and was regarded as a reflection of honor in the community where he was raised. Rooted in his upbringing, values of loyalty, dignity, and respect have consistently guided his choices.

Mr. Amirov's history and characteristics weigh heavily in favor of the sentence we urge. He poses a low risk of reoffending, and there is no need for specific deterrence in this case. Moreover, the notoriety and vigor of his prosecution already serve as a powerful general deterrent for similar potential offenders abroad who believe they can act without consequence. This case sends a very different message.

Taken together, the nature and circumstances of the offense and Mr. Amirov's history and characteristics, analyzed under the factors and purposes of punishment set out in § 3553(a), mandate a sentence of 96 months or less on Counts 1 through 4 to adequately account for just punishment, deterrence, and justice.

## II.  Conditions of Confinement and Mr. Amirov's Deteriorating Health as Mitigating Factors

### A.  Conditions of Confinement

The deteriorating conditions of the federal penal system and Mr. Amirov's declining health are two mitigating factors warranting separate discussion.  Mr. Amirov has endured exceptionally difficult conditions of confinement at the MDC over the past three years, and he can look forward to horrific conditions wherever the BOP may send him.  The declining state of the federal penal system, which has been repeatedly recognized by courts, is an additional compelling reason for a significant downward variance.

The conditions at the MDC have grown horrific in recent years.  *See United States v. Colucci*, 743 F. Supp. 3d 452, 458–62 (E.D.N.Y. 2024) (noting specific instances of violence, substandard living conditions and other problems); *United States v. Chavez*, 710 F. Supp. 3d 227, 233–36 (S.D.N.Y. 2024) (identifying three areas of concern in the post-COVID conditions at MDC: (1) continued reports of inordinate periods of lockdown, (2) claims that the facility provides inadequate and/or substantially delayed necessary medical care and (3) general issues about the physical conditions at the facility).

In *United States v. Chavez,* the Honorable Jesse M. Furman, United States District Judge for the Southern District of New York, described how ongoing staff shortages have led to periods of "near perpetual lockdowns" and "dreadful conditions."  *Chavez*, 710 F. Supp. 3d at 228–29. Detainees regularly suffer from inadequate food, serious deficiencies in medical care, as well as significant limitations on social visits, telephone, commissary, and programming privileges.  Over the course of Mr. Amirov's detention, the MDC has been locked down for days at a time on many occasions.  Thus, despite Mr. Amirov's good behavior in the MDC, the conditions are comparable to those of an inmate being repeatedly sanctioned.

These conditions are only one example of the results of years of disinvestment and disregard for the federal prison system.  The other federal jail in New York City, the MCC, was closed in 2021 after years of serious problems.  Reports of perpetual lockdowns and inadequate medical care at most federal prisons are frequent and reflective of the many years of insufficient funding and continued political opportunism that demonizes incarcerated people.  Mr. Amirov must look forward to very harsh conditions of confinement.  He is unlikely to enjoy the relative benefit bestowed upon those sent to the lowest security facilities.

## B. Health Concerns

The conditions at the MDC, including the lockdowns, staff shortages, and lack of adequate medical care, have aggravated Mr. Amirov's pre-existing health conditions. Mr. Amirov was hospitalized in Turkey for two months in 2019 due to a pinched nerve in his lower back causing pain and numbness in his legs. *See* PSR ¶ 125. Mr. Amirov "continues to suffer from this condition," reporting pain in his left shoulder beginning January 2023 and continuing throughout his detention. *See* PSR ¶¶ 125, 127.

Mr. Amirov has been unable to obtain meaningful relief from this pain, despite seeking medical care countless times since his detainment in 2023. While pain medication was provided sometimes, his repeated requests for orthopedic shoes and orthotic inserts (basic accommodations that could ease his condition) have gone unfulfilled. Back issues can be debilitating and are notoriously difficult to manage, often requiring consistent, specialized treatment and sometimes long-term physical therapy. In a carceral setting, where access to adequate medical attention is limited, such conditions can significantly worsen, leading to chronic pain, reduced mobility, and severe deterioration in quality of life.

Furthermore, Mr. Amirov has been experiencing ongoing respiratory difficulties. He has had persistent difficulty breathing and coughed up blood on numerous occasions. *See* PSR ¶ 126. Mr. Amirov was only provided with an x-ray after repeatedly requesting medical care himself, and other inmates, including his cellmate, expressed their concern for his health to staff. In a September 2025 email to MDC staff, his cellmate urged a more thorough medical evaluation, noting Mr. Amirov has been unable to sleep due to breathing problems and writing, "it is evident that he is feeling bad." *See* Cellmate Email, Ex. O. Mr. Amirov remains without a diagnosis or treatment plan, despite counsel calling these matters to the attention of BOP officials repeatedly.

Mr. Amirov's situation is the remarkable usual at MDC. It offers yet another example of the failure of federal officials to provide minimally adequate conditions of confinement and their legal insulation from the consequences of their inability to meet the basic obligations of jailers. Mr. Amirov is caught up in the systemic failure of the federal prison system. We cannot expect that his incarceration will meet basic standards of decency and humanity or that he will receive anything other than substandard medical care.

Courts have recognized that inhumane and substandard conditions of confinement are grounds for varying below the Guidelines. *See, e.g., United States v. Corbett*, No. 10-CR-184 (PAE), 2023 WL 8073638, at *6 (S.D.N.Y. Nov. 21, 2023) (recognizing that courts have imposed lower sentences on account of severity of conditions of pretrial detention, effectively crediting defendants with more than a day per day served); *United States v. Carty*, 264 F.3d 191, 196–97 (2d. Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures" and remanding the defendant's sentence in light of this holding). Accordingly, the Court should consider Mr. Amirov's 33 months of pre-sentence

detention at the MDC, and the conditions he will encounter as a sentenced prisoner, as additional reasons to vary downwards from the Guidelines.

## III.    The Guideline Calculations

While the PSR correctly recommends a downward variance, it miscalculates the Guideline range in two respects. First, it incorrectly calculates and groups the counts, invoking the wrong Guideline subsection in the calculation of the offense level for the money laundering conspiracy count—contrary to the plain meaning of the statute and the jury's special verdict. Even if the calculation were not incorrect, it would be an absurd result for the money laundering Guideline to drive this attempted murder-for-hire case. Second, the PSR incorrectly finds that Mr. Amirov was a leader or organizer in this offense. We address these two arguments in turn.[1]

### A.  Money Laundering

As noted in the summary of our objection to the PSR ¶¶ 100–102, we urge that the government's Pimentel letter reflects the correct application of the money laundering Guidelines and the grouping rules to the five counts in this case. We urge that the base offense level for Counts 1 through 4 is 37, not 39 as the PSR contends.[2] There is no disagreement that Count 5, the 924(c) charge, stands alone and requires a five-year consecutive sentence. The dispute is over whether the proper offense level for Count 3 (money laundering) is 22 or 39. The money laundering Guideline, U.S.S.G. § 2S1.1, provides two different calculation methods in subsection (a)(1) and (a)(2). The latter subsection applies to this case.

The PSR incorrectly applies § 2S1.1(a)(1) in calculating the offense level for the money laundering conspiracy count. That subsection applies when the laundered money was "derived from" underlying illegal conduct. In those cases, the offense level for the money laundering count is the offense level for the underlying conduct. In all other cases that do not meet the "derived from" test of (a)(1), subsection (a)(2) applies.

---

[1] These two errors have significant consequences. The PSR suggests variation downward from an adjusted offense level of 43, which results in a sentencing range of life, for an offense in which no injury resulted. The government's Pimentel letter calculated a sentencing range of 324 to 405 months, and we urge that the proper range is, at most, 262 to 327 months. We agree with the PSR that a significant downward variance is warranted and urge that while the PSR urges a variance of reasonable magnitude, it misstates the starting point and we note that regardless of the sentence imposed, the law requires correct calculation of the Guidelines and resulting sentencing range.

[2] The total base offense level for Counts 1, 2, and 4 is 37. The properly calculated offense level for Count 3, the money laundering conspiracy, is 22 not 39 as the PSR asserts. Under the grouping rules, the offense level for the group is the highest offense level of any count in the group. So, if the counts are all one group, the offense level for the group should be 37, not 39. If these are two groups, Counts 1, 2 and 4 and Count 3 constituting a separate group, and one group (Count 3) has an offense level nine or more levels below that of another group, no levels are added when the groups are combined. Accordingly, however the grouping rules are applied, if the money laundering Guideline is applied as we contend, the offense level for Counts 1 through 4 is 37, not 39 as the PSR asserts.

Under subsection (a)(2), the amount of money laundered is the key driver of the sentencing range, as specified in the table at U.S.S.G. § 2B1.1. As we explain below, if the offense level for the money laundering is determined under (a)(2), the modest amount of money involved here would result in a lower range and have no impact on the offense level whether these counts are grouped together or separately. If the offense level for the money laundering conspiracy is determined under (a)(1) using the "derived from" test, the offense level for the money laundering count would arguably exceed the offense level for the attempted murder-for-hire counts and would result in a significant and unwarranted increase in the already high offense level. Elevating the money laundering count to drive the sentencing outcome would distort the purpose of this proceeding. This would shift the focus away from the gravamen of the case (attempted murder-for-hire) onto an ancillary charge of money laundering conspiracy.

With that background, there are three reasons the PSR errs in applying subsection (a)(1): *First*, the plain meaning of "derived" confines § 2S1.1(a)(1) to funds originating from the underlying offense; *second,* interpreting it otherwise would produce an absurd result; and *finally,* the jury's special verdict confirms that the laundered funds were used in furtherance of, not derived from, the murder-for-hire offense.

Under a plain reading of U.S.S.G. § 2S1.1(a)(1), the use of the word "derived" indicates that the laundered funds must originate from or be created by the underlying offense. Similarly, the Merriam-Webster Dictionary defines derive as "to take, receive, or obtain especially from a specified source." *Derive*, *Merriam-Webster*, https://www.merriam webster.com/dictionary/derive (last visited Oct. 3, 2025). The funds relevant to this case were not *derived from* the underlying murder-for-hire offense. Rather, the funds were used *in furtherance of* the murder-for-hire offense. This distinction is key to determining the proper grouping of the counts because the improper application of § 2S1.1(a)(1) results in a two-level increase in the adjusted offense level.

Consistent with that view of the plain language, the Second Circuit supports a narrow reading of "derived from," finding (a)(1) applicable only in cases where the money laundered was the proceeds or the product of other illegal conduct, not the means or inducement. The Second Circuit has recognized that the "underlying offense" referred to in § 2S1.1(a)(1) is "the offense which produced the laundered funds." *United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010). In *Menendez,* the laundered funds were derived from a drug transaction, then transferred for money laundering purposes. *Id.* at 265. The court held that "it is undisputed . . . that the 'underlying offense'" is the drug transaction because the laundered money was produced from the transaction. *Id.* at 268. In contrast with *Menendez*, the laundered funds here were not large flows of cash generated by illegal activity. At trial, the government struggled to provide concrete evidence tracking the origin of the money, and their inability to provide concrete evidence became clear in the jury's special verdict, which we discuss.

The *Menendez* court relied on U.S.S.G. Amendment 634, which states that the amendment to § 2S1.1 is:

> [D]esigned to promote proportionality by providing increased penalties for defendants who launder funds derived from more serious underlying criminal conduct, such as drug trafficking, crimes of violence, and fraud offenses that generate relatively high loss amounts, and decreased penalties for defendants who launder funds derived from less serious underlying criminal conduct, such as basic fraud offenses that generate relatively low loss amounts.

U.S. Sent'g Guidelines Manual, app. C supp., amend. 634 (U.S. Sent'g Comm'n 2001). The jury's finding that Mr. Amirov conspired to launder $30,000 is a relatively low amount, as demonstrated by its placement on the table in § 2B1.1. Accordingly, the conspiracy involving Mr. Amirov is not the kind of money laundering offense that the Guidelines are designed to impose a heightened penalty upon.

Reported cases applying the "derived from" test typically involve the laundering of large cash profits from narcotics, fraud, or the like. *See, e.g.*, *United States v. Gomez*, No. 19-CR-379 (WFK), 2025 WL 1201975, at *4 (E.D.N.Y. Apr. 24, 2025) (applying § 2S1.1(a)(1) because the laundered funds were derived from drug transactions); *United States v. Mirzoyan*, No. 10 CR. 895 (PGG), 2017 WL 1501394, at *18 (S.D.N.Y. Apr. 26, 2017) (applying § 2S1.1(a)(1) because the laundered funds were derived from a Medicare fraud scheme). Furthermore, the Southern District has stated that § 2S1.1(a)(1) is to be used where the offense level can be determined "for the underlying offense from which the laundered funds were *obtained*." *United States v. Animpong*, No. 04-CR-1148-1, 2007 WL 38274, at *3 (S.D.N.Y. Jan. 4, 2007) (emphasis added). Taken together, the plain reading of "derived from" and case law make clear that § 2S1.1(a)(1) was not intended to apply broadly to cases where, as here, a modest amount of money was used to promote the offense and was not the ongoing proceeds of a crime generating large amounts of cash.

Moreover, even if the law permitted a very broad reading of "derived from," it should be rejected in this case because it produces an absurd result. This was an attempted murder-for-hire case. The money laundering conspiracy allegation was a small part of the overall plan, according to the government's evidence. The money laundering tail should not wag the attempted murder-for-hire dog. The ultimate sentence imposed must reflect the application of the statutory factors to the case at hand, not the prosecutors' charging decisions or mechanical application of the Guidelines, particularly not where those factors result in a sentence that overstates the seriousness of the defendant's conduct and inflates the sentence.

In *United States v. Dhafir*, 577 F.3d 411, 415 (2d Cir. 2009), the Second Circuit noted the complexities in choosing between § 2S1.1(a)(1) and (a)(2). In *Dhafir*, the application of (a)(1) would have resulted in a lower Guideline range and the sentencing court declined to apply that subsection "in a case such as this, where the defendant is convicted of transferring the funds to

promote an illegal activity other than that from which the laundered funds were derived." *Id.* at 413. The Second Circuit did not criticize the lower court's analysis of (a)(1) but emphasized that when a Guideline is ambiguous or leads to an anomalous result, the sentence to be imposed is governed by the statute, not a mechanical application of the Guidelines. *See id.* at 15.

Lastly, the jury's special verdict rejected both the domestic and international concealment-based money laundering theories, which required proof that the defendant conducted a financial transaction involving property that constituted the proceeds of specified unlawful activity—namely, the "proceeds of murder for hire or of the conspiracy to commit murder for hire." *See* Trial Tr. Day 8, 1347:4–5. The jury did not convict on the theory that defendant acted with knowledge that the transaction was designed to "conceal" the nature, location, source, ownership, or control of the proceeds of the specified illegal activity. *Id.* at 1350:1–4.

By contrast, the jury convicted only on the international promotion theory, which involves "participating in a foreign financial transaction with the intent to promote the *carrying on* of specified unlawful activity." *Id.* at 1354:3–5 (emphasis added). The promotion theory, unlike the concealment theories, turns on an intent to advance or facilitate the underlying offense, not to conceal its fruits. Thus, the special verdict reflects the jury's finding that the transaction was undertaken to further the murder-for-hire scheme, not launder proceeds derived from it.

The practical consequence of the choice between the two money laundering Guideline subsections is quite substantial; however, the counts are grouped. Whether all four counts are counted as one group or two groups, the result is the same. If they are one group, the highest offense level within the group controls. We urge that the highest offense level is the murder-for-hire guideline, not the money laundering guideline. If they are two groups, the much lower offense level for the properly calculated money laundering count has no impact under § 3D1.4(c).

The money laundering count, which was a minor part of the charged conduct, cannot legally or logically drive the Guidelines calculation or the sentence in this case. The PSR incorrectly calculates the Guidelines for the money laundering count. The proper adjusted offense level for the money laundering count is 22, not 39. It would be an error for that relatively minor charge to drive the Guideline calculation and would greatly overstate the seriousness of the offense to calculate the money laundering Guideline as set out in the PSR. A sentence predicated upon that calculation would not be the correct application of the Guidelines to this case, would exceed the dictates of 18 U.S.C. § 3553, would not respect the jury's verdict and would produce an absurd result. The Court must reject it.

## B. Mr. Amirov was not a Leader or Organizer

As also noted in the summary of our objections in the PSR ¶ 104, we urge that it was an error to apply the four-level, aggravated-role enhancement under § 3B1.1(a). The record does not support the finding that he was an "organizer or leader." At most, Mr. Amirov's role was a

"manager or supervisor." Although the government's evidence established that Mr. Amirov is a Vor, establishing this fact is distinct from establishing what role he played in the plot at issue in this case. As such, the offense level should be increased by no more than two levels and certainly not four levels.

According to the Guideline commentary, [3] the key to applying this adjustment is defendant's exercise of decision-making authority, the degree of control and authority exercised over others, the nature of participation in the commission of the offense, and the degree of participation in planning or organizing the offense. *See id.* cmt. n.4.

There is no allegation that Mr. Amirov played a direct role in the attempt to commit the offense in Brooklyn. He was thousands of miles away. Rather, Mr. Mehdiyev ran the on-the-ground operations in the United States. *See* PSR ¶ 50. At most, the government's evidence shows that Mr. Amirov was an intermediary, merely a pawn for the Iranian government, relaying information from the Iranian government to Mr. Mamedov and Mr. Omarov, who then passed this information to Mr. Mehdiyev. *See* PSR ¶ 59. Nor did the evidence demonstrate that Mr. Amirov exercised decision-making authority or any degree of control over others. Instead, it shows that the Iranian government exercised authority and control, as it gave Mr. Amirov assignments and commanded that he finish the job when their assigned assassin, Mr. Mehdiyev, could not be found. *See* PSR ¶¶ 48, 79–80.

With respect to Mr. Amirov's involvement in planning or organizing the offense, the evidence shows that it was minimal, if not non-existent. At trial, the government presented evidence that the planning and organizing of the murder-for-hire plot was done primarily at two levels—the first level, the origin point, involved the Bazghandi Network defendants, who, on behalf of the Iranian government, enlisted the individuals involved in the murder-for-hire plot. *See* PSR ¶ 27. The second level, the end point, involved Mr. Mehdiyev, to whom the role of murderer was assigned. *See* PSR ¶¶ 50, 65–72. The government's evidence did not prove, however, that Mr. Amirov was involved in either hatching the plot or in deciding the details of how it would be carried out.

Because the government's evidence demonstrated that Mr. Amirov acted as an intermediary in the Iranian government's scheme, a four-point adjustment for his role in the offense is unwarranted. We therefore urge that no more than two points be added under § 3B1.1. As argued above, the correct sentencing range in this case is 262 to 327 months, and that range

---

[3] We note that while current Second Circuit law continues to give some weight to the Guideline commentary, other courts have questioned the status of commentary in the light of *Loper Bright*. 603 U.S. 369 (2024). Because governing Circuit law forecloses the argument for now, *United States v. Tabb*, 949 F.3d 81 (2d Cir. 2020) (rejecting claim that Commission exceeded its statutory mandate and citing *United States v. Jackson*, 60 F.3d 128 (2d Cir. 1995)), we reserve Mr. Amirov's rights to seek relief if the governing law on this issue changes.

significantly overstates the seriousness of the offense.  For that reason and all the other reasons noted, a significant downward variance is warranted in this case.

## Conclusion

This case presented relatively simple facts, proven through some very complex electronic evidence, wrapped in a context of state-sponsored violence and the remains of Soviet and Post-Soviet underworld factions.  At the center of this, Rafat Amirov was struggling to return to his family when, the evidence suggests, he was approached by powerful state actors who wanted access to his contacts.  No evidence suggests he had any sympathy for or allegiance to that regime. He was merely a connector and dealmaker in his world and others came to him because he had some authority in his community, but as the trial evidence made clear, that authority was contested. Given the conviction, he understands that he must be punished by this Court and relies upon the Court's fairness, mercy, and keen sense of justice to impose a sentence.

A little more than two years ago, Mr. Amirov faced challenges and was managing as best he could in a very different place from the culture in which he grew up and had made his life. While the events that gave rise to this case loom large for the Americans who unwound this plot from afar, he could not foresee the significance of the calls and texts presented at trial.  The complete rupture of his life has already imposed a very severe punishment that will deter others.

Fortunately, there was no injury to anyone, and Mr. Mehdiyev, who did cause actual harm in New York, was arrested.  For that reason and for all the reasons understood by the Court from presiding over the case, we respectfully urge the Court to impose a sentence of 156 months imprisonment—with 96 months on each of Counts 1, 2, 3, and 4, to run concurrently, with a mandatory and consecutive 60 months on Count 5.  Such a sentence would meet the demands of retribution and deterrence, while promoting rehabilitation, avoiding excessive punishment, and giving Mr. Amirov the chance to return to his family and home if he can survive the punishment he knows must be imposed.

Respectfully submitted,
/s/
Michael W. Martin
Ian Weinstein
Lincoln Square Legal Services, Inc.
*Attorneys for Mr. Rafat Amirov*

On The Letter:
Juliette Donovan
Gwyn Tefft
Ryan Whyte
*Legal Interns*

<u>Attachments</u>:
Exhibit A: Letter of ██████████, Wife
Exhibit B: Letter of ██████████, Sister
Exhibit C: Letter of ████████, Sister
Exhibit D: Letter of ██████████, Mother
Exhibit E: Letter of ████████, Father
Exhibit F: Letter of ██████████, Daughter
Exhibit G: Letter of ████████, Younger Son
Exhibit H: Letter of ████████, Eldest Son
Exhibit I: Letter of ██████, Brother
Exhibit J: Letter of Neophytos Georgious
Exhibit K: Letter of Peter Weinzierl
Exhibit L: Letter of Douglas Valient Engstrom
Exhibit M: Letter of Nathaniel Moore
Exhibit N: Letter of David Ibarra
Exhibit O: Cellmate Email


cc:     Elena Fast, Esq.
        Michael Perkins, Esq.
        Andrew Patel, Esq.
        Counsel for Mr. Omarov

        Michael D. Lockard, Esq.
        Jacob H. Gutwillig, Esq.
        Matthew J. C. Hellman, Esq.
        Assistant United States Attorneys
        Southern District of New York

        **By ECF & Email**

EXHIBIT A

Very Honorable Judge Colleen McMahon,

I, ██████████, born on ████████████ a 42-year-old wife and mother of three children, write to you with deep respect and hope. I kindly ask that, when sentencing my husband, Rafat Amirov, you take into account our family's social and emotional situation, as well as the difficulties I face as a woman and mother.

Rafat is not only my husband but also the pillar of our family, our moral guide, and a role model for our children. He has always been an exemplary person devoted to family values, justice, and kindness.

I am now left alone with our three children. Their growing up without their father and the breakdown of our family unity have had a profound emotional and psychological impact on us. The children often cry and suffer deeply because of their father's absence. For 33 months, I have tried to appear strong for them, but inside I live with deep emptiness and loneliness.

As a woman, mother, and wife, I sincerely ask that you take our family's condition into account and support my husband's release. This decision would bring emotional comfort and renewed hope to our family and allow us to rebuild our lives.

Respectfully,

██████████
██████

Çox hörmətli hakim xanım Colleen McMahon,

Mən, ████████████████████, ████████████ il təvəllüdlü, 42 yaşlı bir həyat yoldaşı və üç uşaq anası olaraq, Sizə dərin hörmət və ümidlə müraciət edirəm. Xahiş edirəm ki, həyat yoldaşım Əmirov Rafət Əlirza oğluna hökm çıxarılarkən ailəmizin sosial və mənəvi vəziyyətini, həmçinin mənim bir qadın və ana kimi üzləşdiyim çətinlikləri nəzərə alasınız.

Rafət mənim üçün sadəcə bir həyat yoldaşı deyil, həm də ailəmizin dayağı, mənəvi rəhbəri, övladlarımız üçün örnək bir ata, mənim üçün isə həm sirdaş, həm də dost olmuşdur. O, ailə dəyərlərinə, ədalətə və xeyirxahlığa sadiq insan kimi hər zaman nümunəvi davranış sərgiləmişdir.

Hazırda mən üç övladımla tək qalmışam. Onların atasız böyüməsi, ailə birliyimizin pozulması həm mənəvi, həm də psixoloji baxımdan çox ağır təsir göstərir. Uşaqlar tez-tez ağlayır, atasının yoxluğuna görə dərin kədər və stress yaşayırlar. Mən 33 aydır onların yanında özümü güclü göstərməyə çalışsam da, daxilən böyük bir boşluq və tənhalıq hissi ilə yaşayıram.

Sizdən bir qadın, bir ana və bir həyat yoldaşı kimi xahiş edirəm — həyat yoldaşımın işinə baxarkən ailəmizin durumunu nəzərə alasınız və onun azadlığa çıxmasına dəstək olasınız. Mən və uşaqlarım üçün bu qərar həm mənəvi təsəlli, həm də həyatımızın yenidən bərpası üçün ümid işığı olacaqdır.

Hörmətlə,



# EXHIBIT B

Very Honorable Judge Colleen McMahon,

I, ████████████, born on ████████, a 48-year-old sister, write to you with deep respect. I kindly ask that when issuing a sentence for my brother, Rafat Amirov, you take into account his character, the moral value he holds for our family, and especially the condition of our elderly parents.

Rafat is not only my brother but also the pillar of our family, someone who has left a positive mark on each of our lives. Since childhood, he has been distinguished by his sincerity, kindness, and honesty toward others. Among family, friends, and acquaintances, he is known as a fair, caring, and responsible person.

His absence in recent years has been extremely difficult for our family. Our elderly parents, in particular, wait for him every day, living in prayer and hope. Considering their age and fragile health, it is hard to imagine how deeply this separation has affected them emotionally.

Honorable Judge, as a sister, I respectfully ask you to consider my brother's life, his attitude toward his family and those around him, and his sincere and conscientious nature, and to make a fair and compassionate decision. His return to freedom would not only bring us joy but also grant our family long-awaited spiritual peace.

Respectfully,

████████████
████████

Çox hörmətli hakim xanım Colleen McMahon,

Mən, ███████████████████, ███████████-ci il təvəllüdlü, 48 yaşlı bir bacı olaraq, Sizə dərin ehtiramla müraciət edirəm. Xahiş edirəm ki, qardaşım Əmirov Rafət Əlirza oğlu barədə hökm çıxararkən onun şəxsiyyətini, ailəmiz üçün daşıdığı mənəvi dəyəri və xüsusilə valideynlərimizin vəziyyətini nəzərə alasınız.

Rafət mənim üçün sadəcə qardaş deyil, ailəmizin dayağı, hər birimizin həyatında müsbət iz qoyan bir insandır. Uşaqlıq illərindən bu günə qədər o, insanlara qarşı səmimiyyəti, mərhəməti və dürüstlüyü ilə seçilib. Ailəsində, dost çevrəsində və tanışları arasında hər zaman ədalətli, qayğıkeş və məsuliyyətli bir insan kimi tanınıb.

Son illər ərzində onun yoxluğu ailəmiz üçün çox ağır olub. Xüsusilə yaşlı valideynlərimiz hər gün onun yolunu gözləyir, dua və ümid içində yaşayırlar. Onların yaşını və sağlamlıq vəziyyətini nəzərə alaraq, bu ayrılığın onlara mənəvi baxımdan nə qədər dərin təsir etdiyini təsəvvür etmək belə çətindir.

Hörmətli hakim xanım, mən bir bacı olaraq Sizdən xahiş edirəm ki, qardaşımın indiyə qədərki həyatını, ailəsinə və ətrafına olan münasibətini, onun səmimi və vicdanlı xarakterini nəzərə alaraq, hökm zamanı mümkün qədər insaflı və mərhəmətli qərar verəsiniz. Onun azadlığa qovuşması bizim üçün təkcə sevinc deyil, həm də ailəmizin uzun illərdir həsrətini çəkdiyi mənəvi rahatlıq olacaqdır.

Hörmətlə,



# EXHIBIT C

Very Honorable Judge Colleen McMahon,

I, ██████████, born on ████████████, a 43-year-old sister, write to you with respect and sincerity regarding my brother, Rafat Amirov. I kindly ask that when issuing a sentence, you take into account his character, his devotion to our family, and the emotional hardship our parents have endured due to this separation.

Rafat is not only a brother but also the pillar of our family. He has always shown love and support to us and has treated everyone around him with care and compassion. His honesty, sense of responsibility, and respectful attitude have earned him high regard within our family and among friends.

For the past 33 months, his absence has been a great trial for our family. Our elderly parents have struggled to cope with this separation and pray daily for his release. The emotional void and hardship this has caused in our family are difficult to put into words.

Honorable Judge, I respectfully ask that, when issuing your decision, you take into consideration my brother's attention, sincerity, and sense of responsibility toward our family, our parents, and those around him. His release would bring not only joy to us but also long-awaited comfort and hope to our parents.

Respectfully,



Çox hörmətli hakim xanım Colleen McMahon,

Mən, ████████████, ██████████-ci il təvəllüdlü, 43 yaşlı bir bacı olaraq, qardaşım Əmirov Rafət Əlirza oğlu barədə Sizə hörmət və səmimiyyətlə müraciət edirəm. Xahiş edirəm ki, hökm çıxararkən onun xarakterini, ailəmizə olan bağlılığını və valideynlərimizin bu ayrılıqdan gördüyü mənəvi çətinliyi nəzərə alasınız.

Rafət yalnız qardaş deyil, həm də ailəmizin dayaq sütunudur. O, həmişə ailəmizə sevgi və dəstək göstərmiş, hər zaman ətrafındakılara diqqətli və qayğıkeş yanaşmışdır. Onun dürüstlüyü, məsuliyyətli davranışı və hörmətcil yanaşması ailəmizdə və dost çevrəsində hər kəs tərəfindən yüksək qiymətləndirilir.

Son 33 ay ərzində onun yoxluğu ailəmiz üçün böyük sınaq olub. Xüsusilə yaşlı valideynlərimiz bu ayrılığa dözə bilmir, hər gün onun azadlığı üçün dua edirlər. Bu müddət ərzində ailəmizdə yaranan boşluğu və mənəvi çətinliyi sözlə ifadə etmək çətindir.

Hörmətli hakim xanım, Sizdən xahiş edirəm ki, hökm çıxararkən qardaşımın ailəmizə, valideynlərimizə və ətrafındakı insanlara göstərdiyi diqqəti, səmimiyyəti və məsuliyyətini nəzərə alasınız. Onun azadlığa qovuşması bizim üçün yalnız sevinc deyil, həm də valideynlərimizin uzun müddət həsrətində olduğu mənəvi rahatlıq və ümid qaynağı olacaqdır.

Hörmətlə,



# EXHIBIT D

Very Honorable Judge Colleen McMahon,

I, ████████████, born on ████████████ a 71-year-old mother with serious health problems, write to you with deep respect. I kindly ask that, when sentencing my son Rafat Amirov, you take into account that I am an elderly and ill mother, as well as the emotional suffering caused by his long separation from his family.

Each time I speak with my son, he speaks of your fairness, compassion, and humanity with great respect. When I heard that his eyes filled with tears during court, I was deeply moved as a mother. He often says, "Judge Colleen McMahon reminds me of my mother; I see maternal compassion in her face." These words are a source of comfort and hope for me.

My son has long suffered from a neurological and muscular disorder. For 33 months I have been separated from him, shedding tears daily and praying every night that you render a just and merciful decision.

Rafat has always been a kind, honest, and helpful person in our family and community. He has made it his duty to help those in need and has consistently worked for the good of others.

As a mother, I sincerely ask that you show mercy and understanding when sentencing my son. My greatest wish at this stage of my life is to see my child free again and to hold him in my arms once more.

Respectfully,



Çox hörmətli hakim xanım Colleen McMahon,

Mən, ███████████████ ████████████-cü il təvəllüdlü, 71 yaşlı və səhhətində ciddi problemləri olan bir ana kimi, Sizə dərin ehtiramla müraciət edirəm. Oğlum Əmirov Rafət Əlirza oğluna hökm çıxarılarkən, mənim yaşlı və xəstə bir ana olduğumu, həmçinin onun uzun müddətdir ailəsindən uzaqda olmasının yaratdığı mənəvi sarsıntını nəzərə almanızı xahiş edirəm.

Oğlumla hər dəfə danışdığımda, o, Sizin ədalətli, mərhəmətli və insani münasibətinizdən hörmətlə bəhs edir. Hətta məhkəmə zamanı onun gözlərinin dolduğunu eşitdikdə, bir ana kimi dərindən təsirləndim. O, tez-tez deyir ki, "hakim xanım Colleen McMahon mənə anamı xatırladır( sizin simanız mənə çox bənzəyir), onun simasında ana şəfqəti görürəm." Bu sözlər bir ana üçün həm təsəlli, həm də ümid mənbəyidir.

Oğlum uzun illərdir sinir və əzələ xəstəliyindən əziyyət çəkir. 33 aydır ki, mən ondan uzağam və hər gün göz yaşı tökərək, hər gecə Sizə dua edirəm ki, ona qarşı ədalətli və mərhəmətli qərar verəsiniz.

Rafət ailəmizdə və cəmiyyətdə hər zaman xeyirxah, vicdanlı və insanlara yardım etməyə çalışan biri olub. O, ehtiyacı olanlara kömək etməyi özünə borc bilib və daim cəmiyyətin rifahı üçün çalışıb.

Sizdən bir ana kimi xahiş edirəm — oğluma hökm oxunarkən mərhəmət və anlayış göstərəsiniz. Mənim ən böyük arzum ömrümün bu çağında övladımı bir daha azad görmək və onu son dəfə qucaqlamaqdır.

Hörmətlə,



# EXHIBIT E

Very Honorable Judge Colleen McMahon,

I, ███████████, born on ████████████████, a 74-year-old father, respectfully ask that, when sentencing my son Rafat Amirov, certain humanitarian considerations be taken into account.

I devoted 40 years of my life to working in the oil industry as a laborer to support my family and raise my children to be honest and hardworking individuals. My son Rafat has always been known as a fair, compassionate person dedicated to contributing to the well-being of society. He has consistently supported those in need and, during the 2020 pandemic, provided food aid to more than 200 families.

For 33 months now, I have been unable to see my son. Considering my age and health condition, this separation has been extremely painful for me. I respectfully ask that you consider my advanced age and my last wish to see my son again when passing your judgment.

I hope that your fair decision will grant me the opportunity, in the remaining years of my life, to see my son once more.

Respectfully,

████████████
████████

Çox hörmətli hakim xanım Colleen McMahon,

Mən, ██████████████ , ██████████ ci il təvəllüdlü, 74 yaşlı bir ata olaraq, oğlum Əmirov Rafət Əlirza oğluna hökm oxunarkən müəyyən humanist amillərin nəzərə alınmasını Sizdən xahiş edirəm.

Mən ömrümün 40 ilini neft sənayesində fəhlə kimi çalışaraq ailəmi dolandırmağa və övladlarımı vicdanlı, əməksevər insanlar kimi böyütməyə sərf etmişəm. Oğlum Rafət həmişə ədalətli, mərhəmətli və cəmiyyətin rifahına töhfə verməyə çalışan bir şəxs kimi tanınıb. O, xüsusilə ehtiyacı olanlara dəstək göstərmiş, 2020-ci ildə pandemiya dövründə 200-dən çox ailəyə ərzaq yardımı etmişdir.

Hazırda 33 aydır ki, mən ata kimi oğlumu görə bilmirəm. Yaşım və səhhətimlə bağlı vəziyyətim nəzərə alınarsa, bu ayrılıq mənim üçün çox ağır keçməkdədir. Sizdən xahiş edirəm ki, hökm çıxarılarkən mənim yaşlı bir ata olduğumu və övladımla görüşə olan son arzumu nəzərə alasınız.

Ümid edirəm ki, Sizin ədalətli qərarınız mənim ömrümün son illərində oğlumu bir daha görmək ümidini mənə bəxş edəcəkdir.

Hörmətlə,



# EXHIBIT F

Very Honorable Judge Colleen McMahon,

I, ███████████, born on ███████████, a 16-year-old daughter, write to you with deep respect and hope. I kindly ask that, when sentencing my father, Rafat Amirov, you take into account our family's situation and my psychological state.

As a woman, you surely understand that a father holds a very special and irreplaceable place in a daughter's life. My father has been not only a parent but also my first friend, protector, and greatest supporter. His absence for the past 33 months has deeply saddened me and had a strong emotional impact.

His absence has affected many areas of my life, especially my education. During my university entrance exams, I was under great emotional stress, which negatively affected my results, and I was not admitted. But during our last conversation, my father encouraged me, and I promised him that next year I will surely succeed and make him proud.

As a young woman, I kindly ask you not to keep my father away from me for too long. His freedom would mean not only the restoration of our family unity but also my renewed sense of hope and confidence in life.

Respectfully,

██████████████
███████

Çox hörmətli hakim xanım Colleen McMahon,

Mən, █████████████████, █████████-ci il təvəllüdlü, 16 yaşlı bir qız övladı olaraq, Sizə dərin hörmət və ümidlə müraciət edirəm. Xahiş edirəm ki, atam Əmirov Rafət Əlirza oğluna hökm çıxarılarkən ailəmizin vəziyyətini və mənim psixoloji durumumu nəzərə alasınız.

Bir xanım olaraq yəqin bilirsiniz ki, qız övladının həyatında atasının yeri çox xüsusi və əvəzolunmazdır. Mənim üçün atam yalnız valideyn deyil, həm də ilk dostum, qoruyucum və ən böyük dəstəkçim olmuşdur. Son 33 ayda onun yanımda olmaması məni dərindən məyus edib və mənəvi baxımdan çox təsirləndirmişdir.

Atamın yoxluğu həyatımın bir çox sahəsinə, xüsusilə də təhsilimə mənfi təsir göstərdi. Universitet imtahanı zamanı psixoloji gərginlik içində olduğum üçün nəticələrim gözlədiyim kimi olmadı və qəbul ola bilmədim. Lakin atamla son danışığımızda o, mənə motivasiya və güc verdi. Mən də ona söz verdim ki, növbəti il mütləq universitetə qəbul olunacağam və onun fəxr etdiyi bir övlad olacağam.

Sizdən bir gənc qız olaraq xahiş edirəm — atamı məndən çox uzun müddət ayrı qoymayın. Onun azadlığı mənim üçün təkcə ailə birliyinin bərpası deyil, həm də həyatda yenidən ümid və inam qazanmaq deməkdir.

Hörmətlə,

███████████

# EXHIBIT G

Very Honorable Judge Colleen McMahon,

I, ██████████, born on ████████████, an 18-year-old son, write to you with deep respect. I kindly ask that, when sentencing my father, Rafat Amirov, you take into account how valuable he is to our family and the important role he plays in my life.

My father has been not only a parent but also my closest friend, confidant, and moral support. We used to exercise together, have long conversations, and discuss life and the future. The greatest values he taught me are honesty, hard work, and compassion toward others.

For 33 months now, my father has not been by my side, and this has been a very difficult trial for me. As a university student, I struggle to focus on my studies. It is difficult for me to form close relationships and friendships because my father has always been my best friend.

I sincerely ask that you consider our family's situation and the role my father plays in my life when determining his sentence. I long not only for his freedom but also for the restoration of our family's unity and happiness.

Respectfully,

██████████
██████████

Çox hörmətli hakim xanım Colleen McMahon,

Mən, ████████████████, ████████████-ci il təvəllüdlü, 18 yaşlı bir oğul olaraq, Sizə dərin ehtiramla müraciət edirəm. Xahiş edirəm ki, atam Əmirov Rafət Əlirza oğluna hökm çıxarılarkən onun ailəmiz üçün nə qədər dəyərli bir insan olduğunu və mənim həyatımda tutduğu mühüm rolu nəzərə alasınız.

Atam mənim üçün sadəcə valideyn deyil, eyni zamanda ən yaxın dostum, sirdaşım və mənəvi dayağım olub. Biz hər gün birlikdə idman edər, uzun söhbətlər aparar, həyatı və gələcəyi barədə müzakirələr edərdik. Onun mənə öyrətdiyi ən böyük dəyərlər dürüstlük, zəhmətsevərlik və insanlara qarşı mərhəmətli olmaqdır.

Artıq 33 aydır ki, atam yanımda deyil və bu, mənim üçün çox ağır bir sınaqdır. Universitet tələbəsi olaraq dərslərimə tam diqqət yetirməkdə çətinlik çəkirəm. İnsanlarla yaxın münasibət qurmaq, dostluq əlaqələri yaratmaq mənə çətin gəlir, çünki mənim üçün ən yaxın dost elə atam olub.

Sizdən səmimi qəlbdən xahiş edirəm — atamın cəzası müəyyən edilərkən ailəmizin vəziyyətini və onun mənim həyatımda oynadığı rolu nəzərə alasınız. Mən yalnız atamın azadlığını deyil, həm də ailəmizin birlik və xoşbəxtliyini geri qaytarmaq istəyirəm.

Hörmətlə,



EXHIBIT H

Very Honorable Judge Colleen McMahon,

I, ██████████, born on ████████████████, a 20-year-old son, write to you with deep respect. I kindly ask that, when sentencing my father, Rafat Amirov, you take into account his character, the moral impact he has had on our family and community, and our family's situation.

My father has always taught us to follow the right path, avoid wrongdoing, and value kindness as a life principle. Thanks to his moral guidance and upbringing, I am pursuing higher education and working toward my future. I will never forget the trauma I experienced 33 months ago when police officers arrested my father in front of my eyes. That moment has deeply affected my psychological state. I still relive that day in my dreams and struggle to sleep peacefully, which has negatively affected my studies and concentration.

I am a university student, currently facing emotional distress and difficulty focusing on my education. Therefore, I ask that you consider my father's role in our family, our dependence on him, and his moral character, and render the most lenient and humane sentence possible. As a son, my greatest wish is to embrace my father again and help restore our family's unity.

Respectfully,

██████████
██████

Çox hörmətli hakim xanım Colleen McMahon,

Mən, ████████████████, ████████████-ci il təvəllüdlü, 20 yaşlı oğul olaraq Sizə dərin ehtiramla müraciət edirəm. atam Əmirov Rafət Əlirza oğlu haqda hökm oxunarkən, onun şəxsiyyəti, ailəmizə və cəmiyyətə göstərdiyi mənəvi təsir və ailəvi vəziyyətimiz nəzərə alınmasını xahiş edirəm.

Atam həmişə bizə doğru yolda olmağı, pisliklərdən çəkinməyi və xeyirxahlığı əsas həyat prinsipləri kimi öyrətmişdir. Onun mənəvi təsiri və tərbiyəsi sayəsində mən ali təhsil alıram və gələcəyimi qurmağa çalışıram. 33 ay əvvəl polis əməkdaşları atamı mənim gözümün önündə həbs edərkən həmin gündə yaşadığımız travmanı heç vaxt unutmaram — o hadisə mənim psixoloji vəziyyətimə ciddi təsir göstərib. Hər gecə yuxuda həmin anı görür, sakit yatmaqda çətinlik çəkirəm; bu isə təhsil prosesimə, dərslərə konsentrasiyama mənfi təsir edir.

Mən universitet tələbəsiyəm və hazırda psixoloji narahatlıq içindəyəm — dərslərimə tam şəkildə diqqət verə bilmirəm. Bu səbəbdən Sizdən xahiş edirəm ki, hökm çıxarılarkən atamın ailədəki rolu, bizim onunla bağlı asılılığımız və onun mənəvi xasiyyəti nəzərə alınsın və mümkün qədər yüngül, humanist cəza tətbiq edilsin. Bir oğul olaraq ən böyük arzum atamın yanına qayıdıb onu yenidən qucaqlamaq və ailəmizin bərpasına kömək etməkdir.

Hörmətlə,



# EXHIBIT I

Very Honorable Judge Colleen McMahon,

I, ██████████, born on ████████████ a 40-year-old brother, write to you with deep respect. I kindly ask that, when sentencing my brother Rafat Amirov, you take into account his personality, his moral importance to our family, and the condition of our parents.

My brother Rafat has been not only a family member but also my closest friend, confidant, and moral support. He has always taught me honesty, conscience, and fairness toward others. His way of life and behavior have served as an example to me and earned him great respect in our family.

For 33 months now, my elderly parents have been praying and shedding tears for him every night. Considering their age and health, I wish to express how deeply this separation has affected our family. I, too, have suffered greatly both emotionally and financially and await his release with great longing.

Honorable Judge, I respectfully ask that, when passing judgment, you consider all these factors and impose the lightest possible sentence. His freedom would be not only a great joy for our family but also a source of peace and relief for me personally.

Respectfully,

██████████
██████████

Çox hörmətli hakim xanım Colleen McMahon,

Mən, ██████████████████, ████████████ ci il təvəllüdlü, 40 yaşlı bir qardaş olaraq, Sizə dərin hörmətlə müraciət edirəm. Xahiş edirəm ki, qardaşım Əmirov Rafət Əlirza oğluna hökm çıxarılarkən onun şəxsiyyətini, ailəmiz üçün daşıdığı mənəvi əhəmiyyəti və valideynlərimin vəziyyətini nəzərə alasınız.

Qardaşım Rafət mənim üçün sadəcə bir ailə üzvü deyil, eyni zamanda ən yaxın dostum, sirdaşım və mənəvi dayağım olub. O, mənə hər zaman dürüstlük, vicdan və insanlara qarşı ədalətli davranmaq kimi dəyərləri aşılayıb. Onun həyat tərzi və davranışları ilə mənə örnək olması, ailəmizdə böyük hörmət qazanmasına səbəb olub.

Artıq 33 aydır ki, valideynlərim — yaşlı anam və atam — hər gecə onun üçün dua edir, göz yaşı tökürlər. Onların yaşını və sağlamlıq vəziyyətini nəzərə alaraq bu ayrılığın ailəmizə nə qədər ağır təsir etdiyini Sizə bildirmək istəyirəm. Mən özüm də həm mənəvi, həm də maddi baxımdan bu vəziyyətdən ciddi sarsıntı keçirirəm və qardaşımın azadlığa çıxacağı günü səbirsizliklə gözləyirəm.

Əziz hakim xanım, Sizdən xahiş edirəm ki, hökm çıxarılarkən bütün bu amilləri nəzərə alasınız və qardaşıma mümkün qədər yüngül cəza tətbiq edəsiniz. Onun azadlığa qovuşması təkcə ailəmiz üçün deyil, həm də mənim üçün ən böyük sevinc və mənəvi rahatlıq mənbəyi olacaqdır.

Hörmətlə,



# EXHIBIT J

TRULINCS ████511 - GEORGIOU, NEOPHYTOS - Unit: BRO-K-C

---------------------------------------------------------------------------------------------------

FROM: ████511
TO: Louise, Barry
SUBJECT: RAFAT AMIROV
DATE: 07/15/2025 12:57:40 PM

from inmate ████511
TO  THE HONORABLE JUDGE COLLEEN McMahon
DATE  07/14/2025

THE HONORABLE COLLEEN MCMAHON
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

   YOUR HONORABLE JUDGE COLLEEN McMahon.
i an righting this letter of reference for Mr.. Rafat Amirov who i have now known for a period of 13 months, a man whos caring nature and heartfelt compassion shine through in every interaction Rafat is a beacon of warmth and kindness consistently showing empathy and understanding in all that he does.

his presence creates a safe and nurturing environment for those around him, Mr Rafat is admired for his unwavering integrity and genuine concern he extends to his friends fellow inmates and to members of staff at the MDC.

every encounter with Mr Rafat is marked by his attentive listening, his willingness to assist without hesitation and a spirit of selfless  service that is truly inspiring. on many occasions Rafat has stepped in as a peace maker and prevented potentially serious fights between inmates and assited members of the MDC staff on many occasions.

he on one occasion assisted an inmate who was his cell mate at the time who suffered from a skull fracture after falling down from the top bunk, and seriously injured himself, he gave him first aid by keeping him awake and alert until members of the MDC staff arrived.

Mr Rafat has always spoke very highly of his family values and how much he loves and cares for his family and prays every day, that the day will come when he will be reunited with his family.

your Honorable judge Collen McMahon I wholeheartedly endorse Rafat Amirov as a caring and remarkable individual whose character and kindness make him an asset to any community or endeavor.

thank you your honorable judge Colleen McMahon.

Neophytos Georgiou ████5511.

# EXHIBIT K

TRULINCS█████511 - WEINZIERL, PETER - Unit: BRO-K-C

---------------------------------------------------------------------------------

FROM: █████511
TO:
SUBJECT: Letter in support of Rafat Amirov #█████054
DATE: 07/14/2025 06:14:40 PM

July 12th, 2025

THE HONORABLE COLLEEN MCMAHON
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK
500 PEARL STREET
NEW YORK, NY 10007

Dear Judge McMahon,

Mr. Rafat Amirov has asked me to assist with a personal letter in connection with his sentencing. I am happy to provide such letter.

For the last two months, Mr. Amirov and myself have been sharing a cell at MDC Brooklyn. Being confined to around 80 sq.ft. every day for the better part of 24 hours requires a good amount of mutual respect. It is also an experience that will reveal how a person behaves towards others.

Mr. Amirov has made no secret of his past and of the crimes that he has been found guilty of. I understand the graveness of the allegations and I do not intend to second guess the decision that the jury has reached. However, my experiences with Mr. Amirov over the past two months make me feel as if I am talking to a different person than the one convicted. Mr. Amirov may have a rough appearance and a way to express himself that may seem impulsive and harsh to many; however, I am convinced that such first impression does not do justice to his kind heart within.

Among the many good properties that I have observed in Mr. Amirov, I would foremost mention kindness and generosity: resources are scarce in a detention center such as the MDC Brooklyn, but Mr. Amirov is always willing to share the little that he has with other inmates who are more in need. In second place, I would rank his wish to live a calm and quiet life. He is avoiding conflict and respected within the inmate community as a peacemaker who helps to resolve other people's differences with authority and in a fair manner. Thirdly, he is disciplined and motivates others to be as well. I can speak from my own experience as he makes me exercise every day, which has helped my 60-year old body to better withstand the challenging conditions in MDC Brooklyn. And lastly, he appreciates proper order and cleanliness, which is a good quality in life in general and for a cellmate in particular.

Helping Mr. Amirov in these hard times is a strong belief in god which is genuine and - I feel that I need to point out in the given context - not extremist. Based on his faith, Mr. Amirov wishes to lead a better life, taking care of his wife and children which he has not seen for years and which he is at risk of not seeing for years to come. No matter what his past may have been, I hope and pray that Mr. Amirov will have a chance to be united with his loved ones again in the not so distant future.

I will be happy to provide more detailed information if so required.

Sincerely yours
Peter Weinzierl
BoP#█████511

# EXHIBIT L

TRULINCS ████506 - ENGSTROM, DOUGLAS VALIANT - Unit: BRO-K-C

---------------------------------------------------------------------------------------------

FROM: ████9506
TO:
SUBJECT: Rafat Amirov #████054
DATE: 07/15/2025 11:20:07 AM

14 Jul 2025

THE HONORABLE COLLEEN MCMAHON
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK
500 PEARL STREET
NEW YORK, NEW YORK 10007

Dear Judge McMahon,

I write to you on behalf of Rafat Amirov. Over the past year that I've known Rafat, I have seen the depth of his character through the kindness and consideration that he shows to his fellow inmates. He treats everyone with respect and equitability. He organizes workouts for any who want to join him, encouraging them through all they accomplish. He has broken up fights and gotten each side to talk to each other.

Rafat cared for one of his previous cellmates, Mohammed, after he sustained several skull fractures from falling from the top bunk onto the concrete. He forced him to stay awake and kept him alert for hours until medical assistance arrived. Both were taken to the Special Housing Unit due to Rafat's language barrier, but returned immediately once Mohammed recovered and clarified that an accident had happened. In fact, Rafat more than likely had saved his life.

Personally, Rafat has been incredibly kind to me, treating me like a human when many others are overtly hostile. He has stuck up for me and ensures that I am treated well during our time together. He is truly a pillar of our small community. With this, I cannot believe the charges against him. I feel compelled to speak out against the vilification against this man and urge you to see the man that we all care about.

Thank you for your valuable time,
Douglas Engstrom #████-506

EXHIBIT M

TRULINCS ███053 - MOORE, NATHANIEL - Unit: BRO-K-C

---------------------------------------------------------------------------------------------

FROM: ███4053
TO: Moore, Megan
SUBJECT: Rafat Amirov #███-054
DATE: 07/15/2025 11:15:03 AM

TO: HONORABLE COLLEEN MCMAHON                              07/15/25
UNITED STATES DISTRICT JUDGE                        FROM: NATHANIEL MOORE
SOUTHERN DISTRICT OF NEW YORK
500 PEARL STREET
NEW YORK, NEW YORK 10007
Dear Judge McMahon,

 Hello my name is Nathaniel Moore i am an inmate at Brooklyn MDC this letter is in reference to Rafat Amirov to be given to his
sentencing judge. since i have been here on unit K-83 RAfat has been such a help within the unit with so many things as well
as a positive example of the way that a person should live and conduct themselves.
 There have been many instances when and where i have personally observed this man encouarge others to live and harmony
and help one another as opposed to fighting, being negative and unhumanlike towards one another. so many times ive watched
him break quareling parties and circumvent potential race wars, religious riots and plots against staff even.
 One thing that i can say is that Rafat inspires me to be a better man daily by me just watching him. while i do not even know his
instant offense i would say that whatever it may be he is definitely a different person now. if anyone should be granted any type
of leiency it should be one Rafat. i would hope that Your Honor will take these things into consideration when comes to
sentencing this man. please be lenient Your Honor? thank you

                                                          - Nathaniel Moore

# EXHIBIT N

TRULINCS ████511 - IBARRA, DAVID - Unit: BRO-K-C

---------------------------------------------------------------------------------------------------

FROM███511
TO:
SUBJECT: RAFAT AMIROV-████054
DATE: 07/15/2025 02:56:09 PM

THE HONORABLE COLLEEN MCMAHON
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT NEW YORK
NEW YORK, NEW YORK 10007

Judge i can say this with confidence of Rafat Amirov that he is one of the most humble and wise men i have met while being incarcerated. I have been fortunate enough to be Rafat's cell neighbor for a couple of months who not only looked out for me (which i initially thought when i first arrived at the unit) but looked out for the entire unit making peace and respect amongst each other no matter what race, background nor the type of federal charges the individual had. While living next to him, he would make sure i was doing okay and had food and snacks and made sure if any issues arised (towards me) to advise him of them and he would resolve them respectfully.

Rafat is a big staple to our unit, without him the unit would be affected in a negative way with him already having stopped fights and arguments which helped us all immensely. I was also aware of his previous cell mate Mohanned who had a wife and children to go home to and on multiple occasions Mohanned expressed thoughts of mental and emotional breakdowns and without hesitation Rafat showed care and support towards him with uplifting words and prayers despite his language barrier.

I certainly hope you can look at the man who stands before you for who he is and how we all have seen him and interacted in one way or another during this difficult time in our lives and look past his federal charges that are against him.

-David Ibarra ████511

# EXHIBIT O

TRULINCS ██████054 - AMIROV, RAFAT - Unit: BRO-K-C

---------------------------------------------------------------------------------------------

FROM: ██████054
TO: Sick Call
SUBJECT: Re: Re: ***Request to Staff*** AMIROV, RAFAT, Reg# ██████054, BRO-K-C
DATE: 09/27/2025 12:58:28 PM

My cell mate does not speak English - I just see his condition.

Last night, as you can see from the cameras, I went to sleep at 3.30 am because he was feeling bad and I waited till he was feeling better. I see that he feels bad, that I write to you from his account. Therefore I write to you because I can see that nobody pays attention and believes that he is feeling bad. Undoubtedly he requires assistance because he has a health issue and I am worried about him. Therefore I wrote from his account and he will receive your reply and you will discuss matters directly with him.

Thank you for the reply
-----Sick Call on 9/27/2025 9:57 AM wrote:

>
I cannot discuss another inmate's medical conditions. Please have him reach out to sick call.

From: ~^! AMIROV, ~^!RAFAT ██████054@inmatemessage.com>
Sent: Thursday, September 25, 2025 10:39 AM
Subject: ***Request to Staff*** AMIROV, RAFAT, Reg# ██████054, BRO-K-C

To:
Inmate Work Assignment: Unit 83

Good morning,

I am Mr. Amirov's cell mate. I see every night for the last 15 days that Mr. Amirov cannot get sleep and has problems to breeze. I am very concerned that something might happen to him. For the last 3 days he tells me that he feels dizzy and that his head is spinning. This morning he was altogether feeling bad. He told me that he has high cholesterol and elevated blood sugar levels. I repeat again, that I am very concerned and that it is evident that he is feeling bad. Can you please give him a more thorough examination. He told me that you took blood samples about 2 months ago, but he was never given the results of the analysis, so please provide them to him.

Apologies for disturbing you with this matter.